CASLER *v.* THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY.

The words, "settled limits of the United States," in the condition of a life policy, restrict the assured within the geographical boundaries of the Union, including the Territories, organized and unorganized, and not within the inhabited portions of the country or the region of settlements. *Held,* accordingly, that such condition was not violated where the assured joined an emigrant train, in 1850, on the overland route to California, and died in the wilds on the south fork of Platte river.

APPEAL from the Supreme Court. Action to recover the amount insured by a policy issued by the defendant upon the life of Nicholas Casler, of which the plaintiff was the assignee. One of the conditions of the policy was, in substance, that if the assured should pass beyond the settled limits of the United States (excepting into the settled limits of the British pro-

vinces of Canada, &c.), or visit parts of the United States lying south of the southern boundary of Virginia and Kentucky during certain periods of the year, then the policy should be void.

The complaint averred the issuing of the policy and its assignment, and that the death of Casler took place on the 21st June, 1850, within the settled limits of the United States, and while the policy was in force. The answer denied the averment in respect to the death of Casler, and alleged affirmatively that on the 21st of June, 1850, he was beyond the settled limits of the United States.

Upon the trial, before Mr. Justice PRATT, without a jury, it was proved that, in the spring of 1850, Casler started upon a journey to California by the route over the plains, from Fort Independence, in the direction of the Great Salt Lake, and at the upper crossing of the south fork of the Platte river was seized with cholera and died there on the 21st of June, 1850.

The judge found, among other things, that the insured died at the time and place specified in the complaint, and, as a conclusion of law, that he did not pass, and was not, at the time of his death, beyond the settled limits of the United States.

The judgment entered, upon his direction, for the plaintiff, was affirmed at general term, in the fifth district, and the defendant appealed to this court.

*Frederick W. Hubbard*, for the appellant.

*James F. Starbuck*, for the respondent.

BACON, J.    It is claimed, by the counsel for the respondent, that the words "settled limits," as used in the policy, mean "*established boundaries*," and that they are susceptible of no other fair or reasonable interpretation. On the other hand, the defendant's counsel insists that these words are synonymous with the phrase, "the region of the settlements," and that, consequently, as the assured could only reach California by going into and passing through an unsettled region of the country, the policy was forfeited.

It is, on all hands, conceded that the place of Casler's decease was within the established boundaries of the United States. If the words "settled limits" had been only once used in the policy, and in no other connection than the one in which they first occur, I think it would readily be conceded that the most natural and obvious interpretation is that given to them by the plaintiff. The word "settled," when used in connection with the word "limits," has its most natural synonym in the words "fixed," "determined," "established." And the word "limit," most obviously and normally, designates a bound, a restraint, a circumscription, a boundary.

If the words are to be understood in any other sense than as designating the recognized or established boundaries of the country, there are practical difficulties in giving them an application, such as would almost authorize a court to pronounce them void for uncertainty. What are we to understand by "the region of the settlements," and when could a man be said to be within or beyond them? How thickly must, or how sparsely may, any given section of the country be populated, to come clearly within the scope of these terms? We have, in the very heart of this State, a vast region almost entirely untenanted by man. From the eastern boundary of the county of Oneida, extending almost to the shores of Lake Champlain, there stretches a wide expanse of unsettled and, almost literally, an uninhabited country. It is the region of the primeval forests, with their native denizens, an "unbroken, unbounded, magnificent wilderness." Since the unfortunate Herishoff, more than half a century ago, penetrated the western verge of John Brown's tract, and for a short period attempted a residence at the outlet of one of the Moose lakes, not a dozen settlers have ventured to follow him, and locate permanently in this wild region. It is visited, indeed, during certain periods of the year, by sportsmen intent on game, or by those whose purpose it is for a season to banish themselves from society and realize that "boundless contiguity of shade" which the poet sighed for. It is far enough beyond the region of the settlements; and yet it would be a rather startling proposition that any one who should

happen to have such a life policy as this, and who, for the purposes of relaxation, amusement, or the love of adventure, should penetrate that great wilderness, would, by that act, run the risk of forfeiting all his interest in his policy.

Again, there are, in several of the western States, extensive prairies, varying in width from fifty to a hundred miles. On either side are the habitations of men, and the accompaniments and appliances of civilized life; but, in the wide and sea-like expanse, nothing human lives. Suppose the traveler, passing over this region, should be overtaken by sudden illness, and perish in the midst of the prairie, without aid or the power of invoking it: would he be within, or without, the region of the settlements? Considerations like these seem inevitably to lead to the conclusion that the language of the policy must have been used to indicate the established boundaries of the country; and such, upon the whole, I am satisfied, is the interpretation that should be given to them. This is the more natural and ordinary signification of the language, and it is susceptible of a precise and definite application; for the boundaries of the nation are either well known or are capable of perfect ascertainment.

SELDEN, J. The only question in this case which seems to me to require consideration, arises upon the following clause in the policy: "Provided always, and it is hereby declared to be the true intent and meaning of this policy, and the same is accepted by the assured upon the express condition, that, in case the said Nicholas Casler shall die upon the seas, or shall, without the consent of the company, previously obtained and indorsed upon this policy, *pass beyond the settled limits of the United States* (except into the settled limits of the British provinces of the two Canadas, Nova Scotia, and New Brunswick), or shall, without such previous consent thus indorsed, visit any parts of the United States which lie south of the southern boundaries of the States of Virginia and Kentucky, between the first of June and the first of November, &c., this policy shall be void and of no effect."

Casler *v.* Connecticut Mutual Life Insurance Company.

Casler died at the upper crossing of the South Platte river, on his way to California by land. The place of his death was in the Territory of Nebraska, and it seems to have been assumed upon the trial that it was in a wild and substantially uninhabited region. The question to be considered is, whether his being there was a breach of the provision above quoted; and this depends upon the construction to be put upon the phrase, "beyond the settled limits of the United States." It is not denied that the words "United States" were intended to embrace as well the territory organized and unorganized belonging to and under the control of the United States Government as the States proper which have been admitted into the Union; but it is contended that the words "settled limits" mean, not the fixed or established boundaries of the nation, but the "region of the settlements," and, hence, that Casler had no right to go into the wild and unsettled portions of the country.

It is, I suppose, a pretty well settled rule, that the words of a contract are to be understood according to their plain, natural import, unless there is something in the context, or in the circumstances under which the contract was made, which indicates that they were used in a different sense. The primary definition of the word "settled" is placed, fixed, established. It is true, it is also, though more rarely, used as descriptive of a section of country that is "planted with inhabitants;" but it is obvious that it can never, with propriety, be used in the latter sense in connection with the word "limits." Limit means boundary, border, the outer line of a thing, and nothing else, except when used to convey the idea of restraint. There may be a settled region, a settled country, or a settled territory; but there can be no such thing as a settled limit, in the sense contended for. To give the clause in question this signification, therefore, it becomes necessary to change its entire structure, and to substitute for the words "the settled limits," the phrase "the region of the settlements."

Changes as extensive as this are sometimes made by courts in contracts; but never, I apprehend, unless there is something in the nature of the case, or in the contract itself, which impe-

ratively requires it. I can see nothing of the kind here. It is said that the words "settled limits," if by limits is meant boundaries, were unnecessary; that "without the United States" would have better, or, at least, more briefly expressed the meaning. This may be so; but mere redundancy of words is not so unusual as to justify the court in giving an interpretation to the contract which its words do not import. The only argument in favor of such a transmutation, which seems to me to have much force, is based upon the repetition of the words "settled limits" in the same sentence, in connection with the phrase "the British provinces." It is urged that the words must be presumed to have been used in the same sense in both places; and that the phrase "into the settled limits of the British provinces," must mean, into the settled parts or portions of those provinces.

The whole force of this argument rests upon the use of the word "into." Had the language been, "within the settled limits," its literal and obvious meaning would have been that for which I contend. But if the word "into" is thus inappropriate upon one construction, the word "limits" is equally so upon the other. The same may be said of the word "beyond," which does not ordinarily mean outside of, but on the further side of.

Again, it is said, that where boundary was intended, the word boundary, and not limits, was used in the phrase "southern boundaries of the States of Virginia and Kentucky." But the two words were used in their respective places for entirely different purposes: "limits," to describe the outer line of the entire nation; "boundary," a mere division line between two States. The choice of different words, under these circumstances, proves nothing.

But this question does not depend upon any refined criticism upon the language used. The clause is to have a reasonable interpretation. To provide that the insured should not, without the consent of the company, go without the bounds of the United States, would be a perfectly natural and proper provision; and this is precisely what the phrase in question means

upon a plain, literal construction of its terms.   But what sort
of a contract should we have upon the other construction?
Who can interpret the phrase, "the region of the settlements?"
Can any one tell, with any precision, what it means?   Is it
not, in the highest degree, vague and indefinite?   It is a phrase
which would convey some vague idea, if used in a loose conver-
sation, but which would seem to be utterly out of place in a
contract where some degree of precision is required; and yet
it is proposed to discard a phrase used by the parties, the literal
meaning of which is simple, plain and appropriate, and to
substitute in its place one invented by the court, the meaning
of which is utterly vague and uncertain.   I suppose Salt Lake
City to be something of a "settlement."   Could the insured,
under such a policy, go there?   If not, for the reason that the
intermediate territory was unsettled, how near must he get to
the city before he would be in "the region of the settlements?"
Suppose he was residing there when insured: could he go for
any purpose into the surrounding territory, or must he confine
himself to the bounds of the city?   Again, assuming that the
insured could go to Marquette, upon Lake Superior, without
going out of "the region of the settlements," could he cross
from there to the Mississippi river?   Once more, suppose he
should go, by the advice of his physician, upon a hunting or
fishing excursion to the centre of the John Brown tract in this
State, would he, when there, be within or without "the region
of the settlements?"   I confess myself unable to give a satis-
factory answer to any one of these questions.   If such a pro-
vision, provided it was inserted in specific terms, is not one
which the court should absolutely reject for its uncertainty, it
is, at least, as it seems to me, one which should not be inter-
polated at the expense of an entire change in the phraseology
of the contract.

It has been suggested that, by the phrase "settled limits," it
was intended to embrace all the organized States and Territo-
ries of the Union, and to exclude all other territory.   The
language, however, seems ill adapted to express such an idea,
and there is nothing in the circumstances, or in the nature of

the contract, to indicate any such intention. It is certainly safer, and more in accordance with legal principles, where there is so much doubt, to adhere to the plain, literal meaning of the terms of the contract. The judgment should be affirmed.

DENIO, WRIGHT, and WELLES, Js., concurred.

COMSTOCK, Ch. J. (Dissenting.) The learned judge who tried the case, without a jury, was of opinion that the words in the policy, "settled limits of the United States," meant the same thing as the established boundaries of the United States, considered as a confederated nation; and he therefore held, as a conclusion of law, that the assured did not pass, and was not, at the time of his death, beyond the settled limits of the country, so as to violate the condition of the contract. On the appeal in the Supreme Court, a different construction of those words prevailed; it being considered that they were used synonymously with the region of the settlements, or the settled parts, of the United States. The judgment for the plaintiff was, however, affirmed, on the ground that, even according to that construction of the policy, there was no proof in the case showing that Casler died away from, or beyond the region of, the settlements. It was said that judicial notice could not be taken of any such fact, and that there was no proof " that he did not die in the house of a settler who might have cultivated his land, erected his dwelling, and lived in the comforts of civilization."

I agree fully with the Supreme Court that the exterior boundary lines of the United States, as established by treaties with foreign powers, were not in the contemplation of the parties when they made this contract. The clause in the policy upon which the question arises provides that, if the assured should " die upon the seas, or, without the consent of the company, pass beyond the settled limits of the United States, except into the settled limits of the British provinces of the two Canadas, Nova Scotia, or New Brunswick, or without such consent should visit those parts of the United States which lie south

Casler *v.* Connecticut Mutual Life Insurance Company.

of the southern boundaries of the States of Virginia and Kentucky, between the first of June and the first of November," &c., the policy should be void. If the intention had been merely to restrain the person insured from going without the United States, except into the British provinces, the policy would have so declared, in plain words, capable of no double interpretation. The expression of such an idea would have been perfectly simple; and although the words, "settled limits," in their lexicographical meaning, may not absolutely exclude that idea, I am satisfied that not one person in a thousand would have chosen that language. A person, in stating his intention to leave the United States, without saying where he designed to go, would hardly speak of the settled limits of the country, as though there were some disputed boundary question which he had in mind; and so, in making a contract in which it is proposed to bind one of the parties not to go abroad for a certain period of time, the obvious form of expression would be, that he must not depart from the United States. The words of the contract now in question are inappropriate, if understood in that sense; because, in that construction, there were no unsettled limits of the Union. There were no disputes with foreign powers. The national boundaries were everywhere ascertained and defined. The restraining clause in this policy contains an exception expressed in the same language. The insured was allowed to pass into the "settled limits" of the British provinces. These words have the same meaning in both situations. According to the construction contended for by the plaintiff, it must be understood that he had leave, in a general sense, to pass from the United States into those provinces. Now, if a person were going to Canada, and wished to speak of his intention, I think he would say nothing about the "settled limits" of that part of the British empire. Such forms of expression are unusual where the idea is so simple and precise. Again, in the same connection, the insured was restrained from visiting those parts of the United States which lie south of the southern "*boundaries*" of Virginia and Kentucky at a certain season of the year. Here we have the

geographical line which marks the exterior limit of political sovereignties distinctly referred to, in the use of a word precisely appropriate to the expression of that meaning; and I think that this change in the language can only be accounted for by assuming that a restriction of a different kind was intended by this part of the contract.

There is a just and reasonable interpretation of the phrase "settled limits," as applied both to the United States and to the British provinces, which is quite consistent with the nature of the contract. The insurance was upon a life; and some parts of the United States, including in that description all territorial acquisitions, were known to be more favorable to the continuance of human life than others. When the policy was made, the Federal Government had become the owner of a vast extent of unorganized territory, uninhabited by any civilized race, The tide of emigration by sea and overland was setting toward the recently acquired possession on the Pacific coast. Between the States and California, which had not yet been admitted into the Union, and was never organized as a Territory, lay an immense extent of country, included, it is true, in the national boundaries, but unsettled and wild. Through that region was the overland journey; and it was known to be attended with many hazards to human life. These are circumstances proper to be taken into account, because they had a necessary connection with life insurance. No well conducted insurance company would fail to estimate them in considering the risks to be assumed; and we also should give them due weight in construing the language of this policy. They are the surrounding facts which always furnish more or less aid in the interpretation of language. Giving to these facts the influence to which they are justly entitled, and adopting certainly no forced construction of words, I feel great confidence in the conclusion that the settled limits of the United States and of the British provinces, mentioned in the contract, were the regions of civilized habitation, where the life of the assured would be exposed to no extraordinary dangers. I do not think, however, that the policy, understood in this sense, would pre-

vent him from visiting or settling in any of the tracts of wild or uncultivated land which lie within the boundaries of the States, or even of the organized and inhabited Territories. It does not speak of the States individually or separately, but refers to them in a national sense, according to their actual relations with each other under the Constitution, and as owners in common of the national territory. Understanding it thus, the assured was prohibited from passing beyond the exterior line of settlement, whether of his own country or of the British provinces. The journey to California across the plains and over the mountains of the west, and the life of a hunter or trapper in the wilds of Canada, were alike forbidden.

According to this construction of the policy, I do not see how the judgment can be sustained. It is said that the finding at the trial was, that Casler did not pass, and was not, at the time of his death, beyond the settled limits of the United States; but this was found, in terms, as a conclusion of law upon a construction of those words which I consider erroneous. It is also said that there is no proof showing that the place where he died was beyond, or away from, the region of settlement, so as to avoid the policy, conceding the construction to be such as I think it is. But the evidence given on the part of the plaintiff proved, and the fact was unquestioned, that he left the State of his residence for California, by the overland route, and that he died during that journey at the upper crossing of the South Platte river, several hundred miles west of the State of Missouri. Now, the courts are to take notice of the general facts which belong to the geography of the country, whether political or physical. It, therefore, requires no evidence to prove that the place of Casler's death was, at that time, beyond the regions of civilization and settlement, and outside of the boundaries of any State or organized Territory of the Union. We know this judicially; and the defendants are as much entitled to the benefit of a fact thus known, as they are of any matter proved by the testimony. Entertaining no doubt upon this branch of the case, and believing that the construction of the policy is such as I have indicated, I think

its condition was violated by the assured. · The judgment must, therefore, be reversed, and a new trial granted.

DAVIES and CLERKE, Js., concurred in this opinion.

Judgment affirmed.